**Nathra NADER and Albert C. Snyder, Jr., Plaintiffs,**

v.

**Gloria SCHAFFER, Secretary of the State, State of Connecticut, et al., Defendants.**

**Civ. A. No. H 76–20.**

United States District Court, D. Connecticut.

July 14, 1976.

---

Linda F. Donaldson, Alan B. Morrison, Washington, D. C., William H. Clendenen, Jr., New Haven, Conn., for plaintiffs Nathra Nader and Albert C. Snyder, Jr.

Gilbert Lebovitz (Lebovitz, Gussak & Litman), Hartford, Conn., H. William Shure, New Haven, Conn., for Lowell P. Weicker, Jr., amicus curiae.

Barney Lapp, Daniel R. Schaefer, Carl R. Ajello and Robert T. Statchen, Asst. Attys. Gen., Hartford, Conn., for defendant Gloria R. Schaffer, Secretary of the State of Connecticut.

James A. Wade (Robinson, Robinson & Cole) Hartford, Conn., for defendant Democratic Party.

Carl Cella, North Haven, Conn., for defendant Republican Party.

Before ANDERSON, Circuit Judge, CLARIE, Chief Judge, and BLUMENFELD, District Judge.

## MEMORANDUM OF DECISION

ROBERT P. ANDERSON, Circuit Judge:

■ Plaintiffs, Nathra Nader and Albert C. Snyder, Jr., are residents of Winchester, Connecticut. Each has registered as a voter pursuant to Conn.Gen.Stat. §§ 9–20 and 9–21. The basis for this action, brought under 42 U.S.C. § 1983, with jurisdiction based on 28 U.S.C. §§ 1343(3) and 1343(4), to redress the alleged deprivation, under color of state statute, of certain voting and associational rights guaranteed by the federal Constitution, is that plaintiffs refuse to enroll in a political party pursuant to Conn. Gen.Stat. § 9–56 or 9–59 and are, therefore, prohibited from voting in any party primary elections. Because the complaint seeks an order restraining the enforcement of Conn.Gen.Stat. § 9–431 on the grounds of its alleged unconstitutionality, and because the constitutional question raised is not "insubstantial," this three-judge court was convened. 28 U.S.C. § 2281; *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). Plaintiffs have moved, with supporting affidavits, for summary judgment. Defendants, the Secretary of the State of Connecticut, and the Republican and Democratic Parties of Connecticut, have moved to dismiss the complaint. The motion to dismiss is granted and the motion for summary judgment is denied.

Connecticut Gen.Stat. § 9–431 provides in pertinent part:

"*Eligibility to vote at primary.* No person shall be permitted to vote at a primary of a party unless he is on the last-completed enrolment list of such party in the municipality or voting district, as the case may be . . . ."

Plaintiffs' complaint alleges that the actions of the defendant Secretary of the State [1] and her agents in enforcing § 9–431, pursuant to §§ 9–3, 9–4, 9–5, and 9–439, violate plaintiffs' rights in the following manner: (1) by denying them the right to vote in primary elections while extending this right to enrolled party members, deprives plaintiffs of their Fourteenth Amendment right to equal protection of the law; (2) by compelling them either to enroll in a political party or forego a right to vote in a primary election impermissibly forces plaintiffs to choose between a right to vote, on the one hand, and the right freely to associate for the advancement of political ideas, on the other; the latter includes the right to associate with a particular candidate regardless of the candidate's party affiliation; and (3) infringes plaintiffs' right to vote, as guaranteed by Article I, Section 2, cl. 1 and the Fourteenth and Seventeenth Amendments, by preventing plaintiffs from participating in an "integral part"—the primary elections—"of the process by which their United States Senators and Representatives are chosen."

They allege further that "primary elections . . . constitute an integral part of the process established by the State of Connecticut for selecting individuals who will represent and govern plaintiffs in federal, state and local office," and therefore request an order declaring that § 9–431 is unconstitutional insofar as it prohibits them

---

1. Plaintiffs' original complaint, filed January 15, 1976, named only Secretary of the State Schaffer as a defendant. Subsequently, after a "Motion by Defendant to Bring in Additional Defendants," the Republican and Democratic Parties of Connecticut were added as defendants.

from voting in primary elections; and enjoining the Secretary of the State from enforcing § 9–431 so as to prohibit them from so voting.[2]

## Connecticut's Primary Election System

Connecticut law divides potential candidates for office into three categories: those of "major parties," those of "minor parties," and independents or "petitioning parties."[3] The candidates of the major and minor parties are afforded spaces on the ballot for the general election; other candidates may have their names appear on the ballot by fulfilling the petition requirements of §§ 9–453a through 9–453s. Conn. Gen.Stat. § 9–379.

Initially, state or district conventions, as the case may be, of a major party "choose a candidate for nomination to each of the state or district offices" through a "challenge primary" system. Conn.Gen.Stat. § 9–382. Party candidates for municipal office, members of party town committees, and delegates to party conventions, are chosen in each municipality, according to rules prescribed by the party, either by a party caucus, a party convention, or the town committee. Conn.Gen.Stat. § 9–390. If the candidate so chosen is not opposed, he becomes the party's candidate in the general election, and no primary election is held. Conn.Gen.Stat. §§ 9–408 and 9–409. A nonendorsed candidate, however, may force a primary if he meets the three criteria specified in Conn.Gen.Stat. § 9–400, which are that he must (1) have received at least

twenty percent of the votes of the delegates to the party convention present and voting on any roll call; (2) deposit with the Secretary of the State a sum of money equal to five percent of the salary of the office he seeks; and (3) file with the Secretary of the State a petition bearing signatures of a certain number of enrolled party members residing in the jurisdiction under contest, as specified by § 9–400. (For example, a challenger for a statewide office would require 5000 signatures; a challenger for a congressional district office would require 2000 signatures.) It should be noted that plaintiffs seek to participate only in this last step of the nominating process, *i. e.*, the primary election to choose candidates for public offices; they do not seek to participate in party caucuses or conventions, or in the selection of town committee members or convention delegates.

Minor parties are required only to nominate their candidates in a manner prescribed in the party's own rules, which must be filed with the Secretary of the State. Conn.Gen.Stat. § 9–451. Candidates not nominated by either a major or minor party can get on the ballot by presenting to the Secretary of the State a petition bearing signatures equal to one percent of the votes cast for the same office at the last preceding election. Conn.Gen.Stat. § 9–453d.

Enrollment in a political party is, as plaintiffs assert, a public act of affiliation with the party, at least insofar as the voter is required by Conn.Gen.Stat. § 9–56 to appear before the registrar of voters, ap-

---

**2.** The request for certification of this case as a class action, with the class comprised of "all those registered voters of the State of Connecticut who are not enrolled in any political party and who are therefore barred from voting in primary elections," was withdrawn because counsel for the Secretary of the State stipulated at the hearing on the merits that this court's ruling on the validity of § 9–431 would not be limited to plaintiffs Nader and Snyder but would be given statewide application.

**3.** A "major party" is one (a) whose candidate in the last preceding gubernatorial election received at least twenty percent of the total votes for that office; *or* (b) whose candidate for the office in question received, at the last preceding regular election for that office, at least ten

percent of the total votes. Conn.Gen.Stat. § 9–372(e). A "minor party" is one whose gubernatorial candidate received less than twenty percent of the total vote in the last preceding election; *and* whose candidate for the office in question received less than ten percent but at least one percent of the total vote for that office in the past preceding election. Conn. Gen.Stat. § 9–372(f). Independents or "petitioning parties" are candidates or parties who have qualified for nomination for elective office pursuant to the provisions of §§ 9–453a through 9–453s, inclusive, or in instances of nominations for vacancy elections for the offices of state senator or state representative, as provided in § 9–216.

proximately eighteen days before the election, and execute a form giving his name, address, desired party affiliation, any affiliations or requests for affiliations (enrollments) with other parties within the previous six months and the date on which any application had been made for erasure from enrollment in any party, Conn.Gen.Stat. § 9–56; and the enrollment lists are public records, Conn.Gen.Stat. § 9–55. An unaffiliated voter may enroll in a party and participate in a primary election as late as the third Saturday before its occurrence. Conn.Gen.Stat. § 9–56. A voter who is enrolled in a party may at any time apply for erasure from that party's enrollment list, and for transfer to the enrollment list of another party, but he may not vote in any primary for six months following the date of the application for transfer. Conn. Gen.Stat. § 9–59.

## DISCUSSION

■ Plaintiffs' principal argument[4] is that participation in a primary election is an exercise of the constitutionally protected right to vote and of the constitutionally protected right to associate with others in support of a candidate. They also assert that to the latter there is a constitutionally protected correlative right *not* to associate, and to be free from coerced associations. They further claim a constitutionally protected right of privacy of association. Plaintiffs wish to exercise both of these claimed sets of rights, but § 9–431 limits them to one or the other; that is, in order to vote in a party's primary election, plaintiffs must enroll in the party, while on the other hand, if they maintain their stand against enrollment, they are precluded.

The fact that plaintiffs do not enroll in the Democratic or Republican Parties does not prevent them from working in support of or contributing money to their favorite candidates within these Parties or candidates in other major or minor parties; or from giving such support to independent candidates, including themselves. Moreover the plaintiffs are not prevented from signing the petitions of independents or participating in a minor party's candidate selection process as it is established by the party's rules under § 9–451. Connecticut's voting laws clearly provide avenues for supporting candidates of one's persuasion without affiliating with an established "major" political party.

■ Plaintiffs argue that the alternative avenues of political activity open to them under Connecticut law are ineffectual and unrealistic, since in most general elections, only the Democratic and Republican nominees have reasonable probabilities of success. While plaintiffs' contention may gen-

---

**4.** We agree at the outset with plaintiffs, that constitutional standards must be satisfied in primary as well as in general elections, *Smith v. Allwright,* 321 U.S. 649, 661, 64 S.Ct. 757, 88 L.Ed. 987 (1944); cf. *Moore v. Ogilvie,* 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); and that the Secretary of the State's actions which are complained of are taken under color of state law for purposes of 42 U.S.C. § 1983, *Bullock v. Carter,* 405 U.S. 134, 140, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Gray v. Sanders,* 372 U.S. 368, 374–75, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *State of Georgia v. National Democratic Party,* 145 U.S.App.D.C. 102, 447 F.2d 1271, 1276, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971).

Although plaintiffs cite several cases for the proposition that there is a "right" to vote in primary elections, these cases do not hold that there is a right to vote in primary elections even though the voter refuses to comply with constitutionally legitimate rules and requirements of party membership. Indeed, the leading case of *Smith v. Allwright, supra,* involved a primary election system, established by state statute, under which party membership was "the essential qualification for voting in a primary to select nominees for a general election," *id.* at 664, 64 S.Ct. at 765. The petitioner there did not question the party membership requirement, but successfully challenged as unconstitutional his exclusion from Democratic Party membership on the basis of race. It must be presumed that the petitioner was ready, willing, and able to satisfy all other prerequisites for party membership (see 131 F.2d 593, 594 (5 Cir. 1943) (per curiam)), which included a party loyalty oath, 321 U.S. at 653–54 n. 6, 64 S.Ct. 757, because, had he not satisfied all other valid party membership requirements, he would have lacked standing to raise the racial issue. Cf. *Storer v. Brown,* 415 U.S. 724, 736–37, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Clark v. Rose,* 531 F.2d 56, 58 (2 Cir.1976) (per curiam).

erally hold true for national and many statewide elections, both minor party and independent candidates may reasonably anticipate a measure of success in local elections.[5] In any event, any dominant position enjoyed by the Democratic and Republican Parties is not the result of improper support, or discrimination in their favor, by the State. Rather, the two Parties enjoy this position because, over a period of time, they have been successful in attracting the bulk of the electorate, so that they now have substantial followings.

A "major party" embraces a substantial fraction of the total electorate, who have associated together for the purpose of nominating and working for the election of candidates who, as officeholders, will implement the members' political views. "Success" in this endeavor, such as the major parties have achieved, is the ultimate goal of the members' political activities, and does not necessarily call for strict constitutional scrutiny by the judiciary so as to increase the political strength of those who have not actively attempted to advance their political views.

■ Improper State support for the Democratic and Republican Parties cannot be inferred from the fact that their primary elections are closely regulated by statute. In the past, many political nominations were made by a process which both the plaintiffs and amicus curiae [6] briefs have described as the "smoke-filled room." Many states, such as Connecticut, have enacted statutes calling for nomination by primary election, presumably because they find it beneficial to allow the general party membership a voice in the nominating process. See *Bullock v. Carter,* 405 U.S. 134, 148, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). The states also recognize the frequency of elec-

toral success achieved by the Democratic and Republican Parties, and the desirability of having a regularized system for making these Parties' nominations, which are so important to the ultimate selection of governmental leaders. Each state legislature chooses the primary election scheme that it thinks will best promote democratic, electoral and governmental goals. In Connecticut, major party primaries are the subject of detailed regulation, while the nominating processes of minor and petitioning parties are more loosely controlled; this reflects the fact that the State is particularly concerned with the parties which have demonstrated some probability of success in the general election and whose candidates may become holders of public office. Cf. *Buckley v. Valeo,* 424 U.S. 1, 93–96, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (legislature can require candidate to demonstrate a "significant modicum of support" before, respectively, distributing public funds to him, or placing his name on the ballot).

Further there is at least plurality in Connecticut—it is not a "one-party" state—and thus no one party's primary election is completely determinative of the outcome. Compare *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

With regard to the claimed right not to associate, it is true that, in order to vote in a party's primary, plaintiffs must publicly affiliate with that party. But enrollment in Connecticut imposes absolutely no affirmative party obligations on the voter, in terms of time or money, and it does not even obligate him to vote for the party's positions or candidates or to vote at all. The voter's name, however, may be erased

---

5. In terms of the ease of access to the ballot which the Connecticut statutes provide for parties other than the Republican and Democratic Parties, and persons who are not candidates of those Parties, it is interesting to note that, in the 1970, 1972, and 1974 elections, a total of nine candidates who were neither Republican nor Democratic achieved "major party" status. Further, from 1966 through 1974, a total of sixty candidacies achieved "minor party" sta-

tus. And from 1966 through 1975, a total of 969 candidates gathered a number of petition signatures sufficient under § 9–453d to entitle them to be placed on the ballot for the general election.

6. On June 22, 1976 this court granted United States Senator Lowell P. Weicker, Jr.'s motion for leave to file an amicus curiae brief.

from the party's enrollment list on a proper showing that he does not support the party's principles or candidates. Conn.Gen. Stat. §§ 9–60, 9–61; but in actual practice these statutes are not used. Such limited public affiliation is simply not comparable to the coerced orthodoxy imposed by government officials in the cases cited by plaintiffs, such as *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); and *Russo v. Central School District No. 1,* 469 F.2d 623 (2 Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973). (Even if it is assumed that some affiliation is "coerced" by § 9–431, the voter at least may choose his party, whereas in the cases just listed there was no such choice.)

■ Plaintiffs also claim that the public nature of enrollment violates their right to privacy of association by potentially subjecting them to harassment because of their affiliations with a party. It is insufficient, however, for plaintiffs merely to raise the spectre of harassment; instead, they must make a detailed factual showing of actual threats or incidents of harassment. Compare *Buckley v. Valeo, supra,* 424 U.S. at 66–72, 96 S.Ct. 612 with *NAACP v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Cf. *Doe v. Martin,* 404 F.Supp. 753 (D.D.C.1975) (three-judge court); *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (allegations of subjective "chill" are not an adequate substitute for a claim of presently existing, specific harm or a threat of specific future harm to plaintiff, so as to create a case or controversy in suit challenging Army's intelligence-gathering activities). At least one form of potential harassment suggested by plaintiffs—loss of civil service employment due to political affiliation—cannot necessarily be considered a realistic threat since this practice was recently declared unconstitutional by the Supreme Court, at least as to patronage employees in non-policymaking positions. *Elrod v. Burns,* —— U.S. ——, 96 S.Ct. 2673, 49 L.Ed.2d —— (1976).

The State, plaintiffs assert, may not force them to comply with § 9–431 unless the State establishes that it "serves a compelling state interest by the least drastic means available," citing *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and that "No state interest served by Conn.Gen.Stat. § 9–431 is sufficiently compelling to justify depriving plaintiffs of their constitutional rights."

A political party, however, is a voluntary association, instituted for political purposes, with the goal of effectuating the will of its members. *Ray v. Blair,* 343 U.S. 214, 222 n. 9, 72 S.Ct. 654, 96 L.Ed. 894 (1952); *Alcorn ex rel. Dawson v. Gleason,* 10 Conn.Supp. 210, 217 (Hartford County Court of Common Pleas 1941); see also *Fields v. Osborne,* 60 Conn. 544, 21 A. 1070, 1071 (1891). The party's ultimate goal, in the electoral process, is to obtain control of the levers of government by winning elections, so that it may then put into operation its policies and philosophies. See *Ripon Society v. National Republican Party,* 525 F.2d 567, 585 (D.C. Cir. 1975) (en banc); Comment, 40 U.Chi.L. Rev. 636, 654 (1973); Note, 27 Rutgers L.Rev. 298, 303–05 (1974). Plaintiffs agree with this description of political parties; they state that it is a function of parties "to form coalitions of interest groups, providing their members access to power and facilitating the passage of legislation once a party has achieved office." In order to accomplish this goal, the party seeks to nominate those candidates who are most likely to win the general election, while remaining most faithful to the party's (i. e., its members') policies and philosophies. The party's selection of its candidates therefore is an ultimate and crucial element of the party members' political activities.

■ Because the political party is formed for the purpose of engaging in political activities, constitutionally protected associational rights of its members are vitally essential to the candidate selection process. *Cousins v. Wigoda,* 419 U.S. 477, 487, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975); *O'Brien v. Brown,* 409 U.S. 1, 4, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) (per curiam); *Ri-*

pon *Society v. National Republican Party, supra* ; Note, 27 Rutgers L.Rev. 298 (1974). The *Ripon Society* case notes that party members also have a "right to organize a party in the way that will make it the most effective political organization," 525 F.2d at 586. An attempt to interfere with a party's ability so to maintain itself is simultaneously an interference with the associational rights of its members, *id.* at 585; see also *Buckley v. Valeo, supra,* 424 U.S. at 20–22, 96 S.Ct. 612, and *Cousins v. Wigoda, supra,* 419 U.S. at 487–88, 95 S.Ct. 541, all of which cite *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion). The rights of party members may to some extent offset the importance of claimed conflicting rights asserted by persons challenging some aspect of the candidate selection process. 525 F.2d at 588; see also *Cousins v. Wigoda, supra,* 419 U.S. at 487, 95 S.Ct. 541. More importantly, party members are entitled to affirmative protection of their associational rights, see Note, 27 Rutgers L.Rev. 298 (1974). A party, were it a completely private organization with no government regulation, could limit participation in its nominating process to party members. In the regulated situation, the state has a legitimate interest in protecting party members' associational rights, by legislating to protect the party "from intrusion by those with adverse political principles." *Ray v. Blair, supra,* 343 U.S. at 221–22, 72 S.Ct. at 658; see also *Lippitt v. Cipollone,* 337 F.Supp. 1405, 1406 (N.D.Ohio 1971) (three-judge court) (per curiam), *aff'd mem.,* 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972); *Green v. State of Texas,* 351 F.Supp. 143, 145 (N.D.Tex.1972) (three-judge court) (per curiam).

In addition to protecting the associational rights of party members, a state has a more general, but equally legitimate, interest in protecting the overall integrity of the historic electoral process. This includes preserving parties as viable and identifiable interest groups; insuring that the results of primary elections, in a broad sense, accurately reflect the voting of party members. Parties should be able to avoid primary election outcomes which will confuse or mislead the general electorate to the extent it relies on party labels as representative of certain ideologies; and preventing fraudulent and deceptive conduct which mars the nominating process. See generally Note, 27 Rutgers L.Rev. 298 (1974), and Comment, 40 U.Chi.L.Rev. 636 (1973). The Supreme Court has recognized the legitimacy of this state interest in decisions such as *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); and *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

These well established principles are applicable here. *Ray v. Blair, supra,* involved an Alabama primary election system regulated by state statute and carried out at state expense. State party executive committees were given the power to fix political or other qualifications of party members and candidates. The Democratic Party required candidates for Party nomination to sign a pledge stating they would aid and support the Party's ultimate nominees. This was challenged on equal protection, due process, and other constitutional grounds, but the Supreme Court upheld the pledge requirement and stated that it "protect[ed] a party from intrusion by those with adverse political principles," 343 U.S. at 221–22, 72 S.Ct. at 658, and that "A state's or a political party's exclusion of candidates from a party primary because they will not pledge to support the party's nominees is a method of securing party candidates in the general election, pledged to the philosophy and leadership of that party," *id.* at 227, 72 S.Ct. at 661. In specifically disposing of the equal protection and due process claims, the Court stated, *id.* at 226 n.14, 72 S.Ct. at 660:

"[T]he requirement of this pledge, unlike the requirement of color, is reasonably related to a legitimate legislative objective—namely, to protect the party system by protecting the party from a fraudulent invasion by candidates who will not support the party. . . . In facilitat-

ing the effective operation of democratic government, a state might reasonably classify voters or candidates according to party affiliations . . .. This requirement of a pledge does not deny equal protection or due process."

Although, as plaintiffs note, *Ray v. Blair,* involved a party loyalty oath for *candidates* for party office, not one for *voters* in a party election, but the language and reasoning of the Court's opinion imply the validity of a similar requirement, binding members of a party to vote only for a party member as the party's candidate, to run to the ensuing national, state, county or municipal election. Any elector in Connecticut may, however, in the subsequent general election vote for any party's candidate or an independent, as he chooses, and there is no way to compel him to disclose for whom he voted.

Relying on *Ray v. Blair,* a three-judge court in *Lippitt v. Cipollone, supra,* 337 F.Supp. at 1406, upheld Ohio statutes designed to prevent raiding of one party by members of another party, and to preclude candidates from altering their political party affiliations for opportunistic reasons. The court stated that the protection of parties (within their respective party organizations) from intrusion by those with adverse political principles was a legitimate legislative goal.

The Supreme Court ruled in *Storer v. Brown, supra,* that California could bar from the ballot an independent candidate who within the previous year had been a member of a party; this law did not discriminate against such independent candidates, because candidates for *party* nomination were similarly disqualified if they belonged to a *different* party within the previous year. 415 U.S. at 733–34, 94 S.Ct. 1274. In both *Storer,* 415 U.S. at 740–41, 94 S.Ct. 1274, and *American Party of Texas v. White, supra,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744, the Court upheld state laws which barred voters who had already par-

ticipated in a party's nominating process from signing the nominating petitions of other parties.

A three-judge court in *Green v. State of Texas, supra,* at 145, held constitutional certain sections of the Texas Election Code which "prohibit electors who vote for a candidate for one office in a particular party primary from voting in another party primary for a candidate running for a different office." The court stated:

"Far from abridging federal rights, the Texas statutes here under review serve to protect the political rights of Texans to join political parties and to enjoy the free right of association appurtenant thereto with some protection against raids and interference from independents or members of other political parties."

In *Rosario v. Rockefeller, supra,* the Supreme Court upheld New York's "delayed enrollment" scheme which barred voters from participation in a primary election unless they were enrolled in the party prior to the preceding general election—a requirement which resulted, in practice, in "waiting periods" of up to eleven months. Affirming a decision of the Second Circuit, 458 F.2d 649 (1972), the Court ruled that this scheme was properly tailored to prevent "raiding," a practice "whereby voters in sympathy with one party [7] designate themselves as voters of another party so as to influence or determine the results of the other party's primary," 410 U.S. at 760, 93 S.Ct. at 1251. The scheme, therefore, was tied to the "legitimate and valid state goal" of "preservation of the integrity of the electoral process." *Id.* at 761, 93 S.Ct. at 1251.

As we have noted, the phrase "preservation of the integrity of the electoral process" contemplates, in the nominating context, the assurance that primary election results reflect the will of party members, undistorted by the votes of those unconcerned with, if not actually hostile to, the principles, philosophies, and goals of the party. The phrase contemplates the pre-

---

**7.** The Court did *not* say, "voters who are *members* of one party . . . .." It thus left open the possibility that independent voters, as well

as members of other parties; could be guilty of "raiding." But see *Echevarria v. Carey,* 402 F.Supp. 183, 188 (S.D.N.Y.1975).

vention of fraud in the nominating process, and a candidacy determined by the votes of non-party members is arguably a fraudulent candidacy. See *Rosario v. Rockefeller*, 458 F.2d 649, 652 (2 Cir. 1972), *aff'd*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

It is clear from these cases that, in order to protect party members from "intrusion by those with adverse political principles," and to preserve the integrity of the electoral process, a state legitimately may condition one's participation in a party's *nominating* process on some showing of loyalty to that party, and that is precisely what Connecticut does in § 9–431. The enrollment process of § 9–56 is not particularly burdensome, and it is a minimal demonstration by the voter that he has some "commitment" to the party in whose primary he wishes to participate. It does not constitute anything in the nature of an absolute barrier to voting in a primary election because it is beyond the capabilities or powers of an elector to perform as was the case in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (one-year residency requirement), and *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (blacks barred from participation in primary elections). Compare *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). And if plaintiffs choose not to associate, by not enrolling in a party, their right to vote in the *general* election is unaffected. Cf. *Ripon Society v. National Republican Party, supra*, at 586, 588–89.

Plaintiffs argue that § 9–431 does not accomplish legitimate state goals because the "waiting period" for persons who are independent voters, is less than three weeks, and this is an insufficient period to deter fraudulent or deceptive conduct by those planning it. But this argument goes only to the length of the waiting period, and not to the method used. The Connecticut legislature has determined that enrollment approximately three weeks before the primary election is sufficient to demonstrate that a previously independent voter will not, in voting, engage in disruptive or deceptive conduct inconsistent with the as-sociational rights of other party members and the preservation of the integrity of the nominating process. The legislature has, with some logic, imposed a longer waiting period on voters previously enrolled in other parties, as they are perhaps more likely to have a hostile motivation. We fail to see how plaintiffs' position gains any support from the Connecticut legislature's decision not to impose the maximum waiting periods permitted by the Constitution.

Plaintiffs' claim that Connecticut could prevent raiding and other distortive and deceptive conduct by a less drastic means, namely, criminal sanctions against the perpetrators, is not persuasive. Assuming *arguendo* that the "least drastic means" test applies here, that standard does not require the State to choose ineffectual means to accomplish its goals. *Storer v. Brown, supra*, 415 U.S. at 736, 94 S.Ct. 1274. *Rosario v. Rockefeller, supra*, 410 U.S. at 762 n.10, 93 S.Ct. 1245. Although criminal sanctions might be effective to punish the ringleaders of any raiding episode, it would be very difficult to detect and punish all the individual voters who engaged in the proscribed conduct, particularly given the secrecy of the ballot and the difficult specific intent issues which would be involved. See Note, 27 Rutgers L.Rev. 298, 311 (1974). Unless the deterrent aspect of the criminal law were totally effective, such a law would apply only after the damage had been done to the electoral process and would be in the nature of punishment *not remedy.*

The State obviously cannot conduct a test on each voter to determine his political ideas before allowing him to vote in a primary election, and the enrollment requirement of § 9–431 is a constitutionally acceptable surrogate. And given the State's legitimate interest in legislating to protect the associational rights of party members, which rights include the right to put forward candidates who adhere to and symbolize the party's views, § 9–431 recognizes the simple fact that, "No matter how loyal the nominee, if he is chosen by those not in sympathy with the party, he is not that party's nominee." Note, 27 Rutgers

848

L.Rev. 298, 311 n.106 (1974). Cf. *Bendinger v. Ogilvie*, 335 F.Supp. 572, 576–77 (N.D.Ill. 1971) (three-judge court).

From the party's point of view, enrollment also serves an important housekeeping function. Candidates need to know who is in the electorate, so that they (the candidates) can attempt to persuade those individuals to vote for them. Party members who wish to establish, as party policy, a particular course of conduct through the election of a particular candidate, similarly need to know who their supporters are. It is common experience that direct solicitation of party members—by mail, telephone, or face-to-face contact, and by the candidates themselves or by their active supporters—is part of any primary election campaign. But, without the public list of party members which is provided by the enrollment process, such electioneering would become quite difficult. The enrollment requirement of § 9–431, coupled with the three-week waiting period of § 9–456, allows compilation of a list—at the start of the final, crucial weeks of campaigning—of the concerned electorate.

■ Plaintiffs also argue that § 9–431 deprives them of the equal protection of the laws by denying to them the right to participate in elections in which they are "interested" and by which they are "affected," to the same extent as those persons who *may* vote, solely because plaintiffs do not enroll in political parties. Authority cited in support of this argument includes *Hill v. Stone*, 421 U.S. 289, 295–98, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 207–13, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam); and *Kramer v. Union Free School District*, 395 U.S. 621, 632–33, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Although plaintiffs are "interested" in and "affected" by the ultimate selection of their governmental leaders, they are *not* "interested" in primary elections in the crucial, distinguishing aspect that party members are interested. Namely, plaintiffs are *not* "interested" in

nominating the candidate who presents the best chance of winning the general election while remaining most faithful to party policies and philosophies. Plaintiffs' refusal to join any of these voluntary associations, which are organized for the purpose of effectuating their members' political goals, is fundamentally inconsistent with any claim that plaintiffs are as "interested" as party members in the outcome of the party nominating process. The constitutional validity of this distinction between enrolled party members and all other voters, on which § 9–431 is based, is at least implicit in the Supreme Court's flat statement in *Ray v. Blair, supra*, that "a state might reasonably classify voters or candidates according to party affiliations." Section 9–431, therefore, does not make an "invidious discrimination" which would offend the Constitution, *American Party of Texas v. White, supra*, 415 U.S. at 781, 94 S.Ct. 1296; *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Lippitt v. Cipollone, supra*, 337 F.Supp. at 1406. Cf. *Pirincin v. Board of Elections of Cuyahoga County*, 368 F.Supp. 64, 70 (N.D.Ohio) (three-judge court), aff'd mem., 414 U.S. 990, 94 S.Ct. 345, 38 L.Ed.2d 231 (1973):

"[T]o the extent Ohio's election laws limit the right to participate in a party primary or be a candidate for political office, a person is excluded by reasonable restriction but not by a political caste system. There can be no discrimination of constitutional proportion when a man refrains from entering a party primary of one of the two major political parties because he regards himself an independent or a member of a minority party."

■ "Not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972), citing *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). Similarly, a state statute or policy must cause more than a minimal infringement of First Amendment rights before a state is called upon to pro-

vide a "compelling interest" justification. See, e. g., *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471 (2 Cir. 1976), and authorities cited therein. In *Storer v. Brown, supra,* 415 U.S. at 729, 94 S.Ct. at 1279, the Supreme Court stated:

> "[A]ppellants . . . assert that under [certain Court decisions], *substantial* burdens on the right to vote or to associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest. . . . It has never been suggested that [the rule of these decisions] automatically invalidates every *substantial* restriction on the right to vote or to associate." (Emphasis supplied.)

There must be more than a minimal infringement on the rights to vote and of association, therefore, before strict judicial review is warranted. See *Buckley v. Valeo, supra,* and *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973) ("neither the right to associate nor the right to participate in political activities is absolute"); *Kusper v. Pontikes,* 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973) ("a *significant* encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest") (emphasis added).

We, therefore, conclude that § 9–431 is reasonably related to the accomplishment of legitimate state goals. *Rosario v. Rockefeller, supra,* 410 U.S. at 762, 93 S.Ct. 1245.

Plaintiffs, in their argument, have pointed to several perceived flaws in the primary election system which the Connecticut legislature has established. It is asserted, for example, that, "There are, moreover, reasons to believe that if independent voters were able to vote in primary elections, the stability of the political system would actually be enhanced"; and that participation by independent voters in primary elections "will benefit the two-party system by drawing more citizens into the political process at this crucial stage." They also argue that it is "irrational" for the legislature "to presume" that "independent voters are at all likely to engage in raiding," and, as discussed *supra,* that § 9–56 is an ineffective device to bar deceptive conduct by those independents who wish to engage in it. The Secretary of the State, meanwhile, in her argument, has pointed out that, should plaintiffs prevail here, Connecticut would be forced to choose among a number of other types of primary systems, e. g., the "crossover" primary, the "blanket" primary, or the "multiple vote" primary. The amicus curiae brief states that

> ". . . a major factor in the increase in proportion of unaffiliated voters is the discontent and dissatisfaction of large numbers of citizens with the political parties . . .,"

and that excluding independent voters from participation in primary elections serves to increase the feeling of these citizens that they are excluded from an important part of the political process. The amicus brief declares that § 9–431 actually "hinders the operation of the democratic process in an enlightened society such as we enjoy in the State of Connecticut," and asserts that "[n]o political party can derive real strength" from this statute which "compels citizens to affiliate in order to exercise their constitutional rights."

The comparative merits of various forms of primary election systems have been widely debated in this presidential election year. In particular, the "open" and "crossover" primaries, which permit independents and/or members of other parties to participate in a given party's primary, have been the subject of controversy.[8]

8. See, e. g., Editorial, "Adulterated Choice," New York Times, May 25, 1976, at 34, col. 1; M. S. Forbes, Jr., "Wallacites and the GOP," *Forbes,* June 1, 1976, at 19; Barone, "That 'Crossover' Nonsense," Washington Post, May 16, 1976, at C–7; Herbers, "Crossover Voting Makes Primaries More General," New York Times, May 16, 1976, § IV, at 2; Rovere, "Let-

A state may legislate to prevent the perceived evils of crossover voting, e. g., *Rosario v. Rockefeller, supra,* but several states permit crossover voting in their primaries. Others have provision for primaries which allow participation by independents and members of other parties. There is no suggestion that such a clause makes the election laws unconstitutional, nor is it a mandatory prerequisite to constitutionality that independent, non-member electors be permitted to vote in a party's primary. The Connecticut General Assembly has adopted statutes governing political party primaries which it considers best meet the needs of the State. The laws are not invidiously discriminatory but apply to all alike. The legislatures of "[t]he states have broad discretion in formulating election policies." *Tansley v. Grasso,* 315 F.Supp. 513, 519 (D.Conn.1970) (three-judge court), citing *Williams v. Rhodes,* 393 U.S. 23, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *United States v. Classic,* 313 U.S. 299, 311, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); and *Voorhes v. Dempsey,* 231 F.Supp. 975, 977 (D.Conn.1964) (three-judge court) (per curiam), *aff'd mem.,* 379 U.S. 648, 85 S.Ct. 612, 13 L.Ed.2d 552 (1965). Accord, *Bullock v. Carter, supra,* 405 U.S. at 141; see also *Storer v. Brown, supra,* 415 U.S. at 729–30 and 736, 94 S.Ct. 1274.

■ We, therefore, hold that the election laws of the General Statutes of the State of Connecticut, governing primaries are not in violation of the Constitution of the United States, that they provide for legitimate goals through constitutionally permissible means and that there is no need or occasion for the judicial relief requested by the plaintiffs.

■ The record does not disclose that the plaintiffs at any time have sought to have the primary election statutes changed to conform more closely to their views. The laws, as they are now, are not immutable; and, if the plaintiffs, as they imply, are speaking for a generous one-third of the

entire electorate of the State of Connecticut, they should, by using the simple and direct means provided by §§ 9–453a–453s, be able to get one or more of their number on the ballots and, through diligent and thorough campaigning, elect one or more representatives in the legislature. Theoretically the laws are still made by the legislatures and, although the effort to achieve a change in the statutes requires a great deal of time, hard work and infinite patience, it is not impossible. The presently popular course of raising a federal constitutional question and seeking a change in the law by judicial fiat, is quicker, more academically attractive and perhaps more thorough. But such action tends in itself to work in derogation of the separation of powers and our democratic system of government. The courts should not use this power for the purpose of exercising "some amorphous, general supervision of the operations of government," *United States v. Richardson,* 418 U.S. 166, 192, 94 S.Ct. 2940, 2954, 41 L.Ed.2d 678 (1974) (Powell, J., concurring), but only to redress violations of basic human rights to which federal constitutional protections have been extended or to correct governmental action which otherwise conflicts with express provisions of the Constitution. The plaintiffs' case does not fall within these designations.

The defendants' motion to dismiss is granted and the plaintiffs' motion for summary judgment is denied. Judgment may enter accordingly.

---

ter From Washington," *The New Yorker,* June 21, 1976, at 90–91. See generally Note, 27 Rutgers L.Rev. 298 (1974), and Comment, 40 U.Chi.L.Rev. 636 (1973).