Susan E. YOUNG; Gerald D. McGonigle

v.

William M. GARDNER, in his official capacity as Secretary of State of the State of New Hampshire; Charlene E. Arcidiacono, Donald M. Redden, Gail K. Webster, in their official capacities as Supervisors of the Checklist of the Town of Londonderry, New Hampshire; Edward J. Thane, Frances Rivard, John C. Farwell, in their official capacities as Supervisors of the Checklist of the Town of Milford, New Hampshire.

Civ. No. 80–365–D.

United States District Court,
D. New Hampshire.

Sept. 8, 1980.

Susan Young and Gerald D. McGonigle, pro se.

Jeffrey R. Cohen, Asst. Atty. Gen., Concord, N. H., for Gardner.

Richard F. Therrien, Manchester, N. H., for Arcidiacono, Redden and Webster.

Patrick J. Enright, Milford, N. H., for Thane, Rivard and Farwell.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

Plaintiffs Susan E. Young and Gerald D. McGonigle herein seek injunctive and declaratory relief, 28 U.S.C. §§ 2201, 2202, from what they perceive to be violations of their constitutional and civil rights, 42 U.S.C. § 1983, by reason of the application as to them of certain portions of the election laws of the State of New Hampshire.[1] Named as defendants were William Gardner, Secretary of State of New Hampshire, and the individuals who are currently serving as Supervisors of the Checklists in the Towns of Milford and Londonderry, New Hampshire.[2] Defendant Gardner moved to dismiss for failure to state a claim upon which relief can be granted, Rule 12(b)(6), Federal Rules of Civil Procedure, and, as requested by the plaintiffs, an expedited hearing was held on the merits at which evidence was taken, legal memos were presented, and oral arguments were heard. Upon review, the Court having

---

1. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(3), wherein district courts are granted original jurisdiction of any civil action seeking to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

2. The individuals named as Supervisors were ostensibly served in each instance by service on the respective Town Clerk in each town. A motion in behalf of the Supervisors of the Town of Londonderry to dismiss for lack of proper service, Rule 12(b)(5), Fed.R.Civ.P., was initially granted by the Magistrate, but prior to hearing herein the Court granted the plaintiffs' motion to vacate such ruling, desiring to have available to it by stipulation or presentation evidence upon which to base a decision on the merits. In the course of hearing, plaintiff McGonigle, himself an attorney, conceded that service upon the Town Clerk was probably insufficient to constitute proper service on the individual Supervisors of the Checklists, Rule 4(d)(1), Federal Rules of Civil Procedure, and, having heard the evidence and arguments, the Court concurs and dismisses this action as to the named individual Supervisors of the Checklists in Milford and Londonderry for lack of personal service upon them.

heard evidence, Rule 12(b)(6), *supra*, treats the motion as one for summary judgment, Rule 56, Fed.R.Civ.P., and concludes that summary judgment should be entered in behalf of said defendant.

Plaintiff Young is a registered voter in the Town of Milford, who resides within a 15–minute walk of the Milford Town Hall wherein are housed the offices of various Town officials, including Supervisors of the Checklist. On February 26, 1980, she was an Independent voter but on that date elected to vote in the Republican Presidential primary. Upon completion of voting, she went to authorities at the polls and requested the right to be immediately registered again as an Independent voter. She was advised that this would not be possible but that she should check the newspaper and public notices as to the dates upon which the Supervisors of the Checklist would next meet to allow her to so change her registration. She chose not to do so, but on or about June 10, 1980, having decided that she wished to vote in the September primary for candidates other than those of the Republican party, she went to the Milford Town Hall, where she was advised that the period for changing her registration back to that of Independent had expired as of June 3, 1980.

Plaintiff McGonigle, a registered voter in Londonderry, similarly was an Independent who chose to vote in the Democratic Presidential primary on February 26, 1980. In his testimony, he was candid to admit that he did not recall whether as of the date of such voting or shortly thereafter he made known to the Town officials his desire to register once more as an Independent. He now seeks to vote in the Republican primary on September 9, 1980, but again failed to appear before the Supervisors of the Checklist prior to the deadline of June 3, 1980. McGonigle did not read the local newspaper, nor did he seek to go to the Town Hall or other public places where notices as to the meetings of the Supervisors of the Checklist had been posted. In each instance, the Supervisors of the Checklists of the respective Towns had met at least twice between February 26 and June 3, 1980, for the purpose of allowing voters to change their registration, and advance notices of their meetings had been published in local newspapers and posted in writing in public areas such as the Town Hall.[3]

The thrust of the plaintiffs' argument is that New Hampshire has no "compelling state interest", *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Newburger v. Peterson*, 344 F.Supp. 559 (D.N.H.1972) (three–judge court), which requires that change of registration be held on certain dates between primary elections and that their constitutional rights are unduly burdened by what they consider to be an unwarranted imposition of a requirement that they bestir themselves sufficiently to ascertain when and to appear where the meetings of the Supervisors of the Checklists are held. Although unclear, it appears that plaintiffs believe that they should be allowed to change registration immediately upon exiting the polling booth, or in the alternative, furnished with some sort of postcard or other document allowing them to freely mail in their change of registrations. In advancing their argument that they have been deprived of their constitutional rights, the plaintiffs rely heavily upon *Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

The 1977 Session of the New Hampshire Legislature appointed an Oversight Committee to completely recodify the state election laws, mandating that the recodification be prepared for legislative action by the 1979 Legislative Session. (*See* 1–A RSA, 1979 Supp., p. 42.) This mandate was com-

---

**3.** In the course of cross examination of McGonigle, it was suggested that in Londonderry at least he might have sought to change his registration on five or six occasions, *i. e.*, the various days upon which the town meeting was held and the school district meeting was held, all of which occurred during the month of March 1980. McGonigle was unaware of this possibility, stating that from his reading of the statutes, he understood that only two opportunities would be provided by the Supervisors of the Checklist. In any event, he failed to attend any one of the March meetings.

plied with, and upon due consideration the 1979 Legislature enacted, *inter alia*, RSA 654, entitled "Voters And Checklists". RSA 654:15, *Party Registration*, provides in pertinent part:

Whenever names are added to the checklist, the supervisors shall register the party membership of the voter if he desires such membership registered; but, if such voter has already been registered in any town or ward in this state as a member of any party, he shall not be registered as a member of a different party closer in time to the primary than the day immediately prior to the first day for the filing of a declaration of candidacy. . . .

A companion statute, RSA 655:14, requires that declarations of candidacy be filed not more than 96 days nor less than 75 days prior to the primary. Accordingly, persons who wish to change registration in accordance with RSA 654:15 must do so 97 days before the actual next primary election. Additionally, checklist supervisors are required by statute to be in session for the correction of the checklists on at least two separate days, and at such other times as they deem necessary, but such sessions shall not be "closer in time to the primary than the day immediately prior to the first day for the filing of a declaration of candidacy", RSA 654:32.

RSA 654:34, *Change of Registration*, provides in pertinent part

I. Change of registration of a voter whose party membership has been previously registered.

(a) Any legal voter whose party membership has been registered may change such registration by appearing in person before the supervisor of the checklist for his town or ward any time they meet, except as prohibited by RSA 654:15, and stating to them under oath or affirmation, if required, that:

.    .    .    .    .

(2) he does not wish to be registered as a member of any party, in which case his party designation shall be removed from the checklist.

(b) He may also change such registration at any primary, upon making oath or affirmation to the same effect, but he shall not be permitted in such case to vote the ballot of any party at such primary.

.    .    .    .    .

III. Notwithstanding any provision of paragraphs I and II to the contrary, no person who has voted in a primary may thereafter on the day of said primary change his party registration or change his registration so that he is registered as a member of no party.

From examination of the foregoing statutory scheme, it is clear that an Independent voter in the position of the plaintiffs who has chosen to vote in the primary of a registered party may register again as an Independent before the next succeeding primary election, but must do so by appearing before the Supervisors of the Checklist at least 97 days before such next scheduled primary. If a voter wishes to wait until the actual primary to change registration, he or she may do so, but may not then cast a vote at such primary.

New Hampshire's primary balloting regulation results in a nominating procedure widely regarded as a "closed" primary, the form of which prevails in the great majority of states. *See Smith v. Penta*, 81 N.J. 65, 405 A.2d 350 at 352, *appeal dismissed for want of substantial federal question*, 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979). Under such system the statutes generally include some kind of affiliation requirement designed to exclude certain types of voters, which requirements might be designed to prevent from voting in party primaries:

(1) Voters generally affiliated with another party but wishing to cross over to a rival party's primary to support a weak candidate who is likely to lose in the general election to the nominee of the voters' preferred party (raiders); (2) voters generally affiliating with another party but wishing to cross over to support their preferred primary candidate in case the nominee of the voters' own party

loses the general election (second choice supporters); (3) voters generally affiliating with another party but wishing to cross over to support a candidate preferred over any potential nominee of the voters' own party (cross overs); (4) voters generally not affiliating with any party but wishing to support a particular party candidate (independents).

*Smith v. Penta, supra,* 405 A.2d at 352, citing *Developments in the Law–Elections,* 88 Harv.L.Rev. 1111 at 1164 (1975).

Plaintiffs in the instant case urge that they are not interested in "raiding" and are sincerely Independents, as they are believers in the modern–day political approach wherein it is more important to address the issues and vote for the individual candidate than to adhere to the platform or position of a political party. This argument necessarily overlooks the historical and present–day importance of political parties as eloquently outlined by Mr. Justice Powell:

Until today, I would have believed that the importance of political parties was self–evident. Political parties, dependent in many ways upon patronage, serve a variety of substantial governmental interests. A party organization allows political candidates to muster donations of time and money necessary to capture the attention of the electorate. Particularly in a time of growing reliance upon expensive television advertisements, a candidate who is neither independently wealthy nor capable of attracting substantial contributions must rely upon party workers to bring his message to the voters. In contests for less visible offices, a candidate may have no efficient method of appealing to the voters unless he enlists the efforts of persons who seek reward through the patronage system. Insofar as the Court's decision today limits the ability of candidates to present their views to the electorate, our democratic process surely is weakened.

Strong political parties also aid effective governance after election campaigns end. Elected officials depend upon appointees who hold similar views to carry out their policies and administer their programs. Patronage–the right to select key personnel and to reward the party 'faithful'–serves the public interest by facilitating the implementation of policies endorsed by the electorate.

*Branti v. Finkel,* 445 U.S. 507, at 528, 100 S.Ct. 1287, at 1300, 63 L.Ed.2d 574 (Powell, J., dissenting) (footnotes omitted).

Additionally, plaintiffs' reliance on *Kusper v. Pontikes, supra,* is misplaced. In that case, the Illinois statute at issue prevented one who had voted in a party primary from voting in the primary of another party for a period of 23 months. In upholding the ruling of the trial court that such statute was unconstitutional, the Court contrasted the situation in *Kusper* with that in *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), wherein the constitutionality of a New York statute requiring enrollment in a party of choice at least 30 days before a general election and thus preventing a change in party affiliation for 11 months was upheld. In its discussion of *Rosario,* the *Kusper* Court said

The New York statute at issue in *Rosario* did not prevent voters from participating in the party primary of their choice; it merely imposed a time limit on enrollment. Under the New York law, a person who wanted to vote in a different party primary every year was not precluded from doing so; he had only to meet the requirements of declaring his party allegiance 30 days before the preceding general election. The New York law did not have the consequence of 'locking' a voter into an unwanted party affiliation from one election to the next; *any such confinement was merely the result of the elector's voluntary failure to take timely measures to enroll. Id.,* at 757, 759 [93 S.Ct., at 1250.] The Court therefore concluded that the New York delayed–enrollment law did not prevent voters 'from associating with the political party of their choice'. *Id.,* at 762 [93 S.Ct., at 1252.] *And see id.,* at 758 and n.8 [93 S.Ct., at 1250.]

*Kusper, supra,* 414 U.S. at 60, 94 S.Ct. at 309. (emphasis supplied).

Moreover, subsequent to its decision in *Kusper, supra,* the Court in *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), upheld a California statutory requirement that signatures on an independent candidate's nominating papers be obtained within 24 days following a primary and conclude 60 days prior to the general election, with none of the signatures thereon to be those of persons who had voted at the primary. In the course of its opinion, the Court discussed the rules outlined in its cases of *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), pointing out that the rule of those cases did not automatically invalidate *every substantial restriction on the right to vote or to associate.* 415 U.S. at 729, 94 S.Ct. at 1278 (emphasis supplied). The Court additionally pointed out that the decision in *Kusper, supra,* did not represent a retreat from *Rosario, supra,* 415 U.S. at 731, 94 S.Ct. at 1279, and concluded that the 12–month waiting period which was the effective result of the California statute did not violate the rule established in *Rosario,* 415 U.S. 734, 94 S.Ct. at 1281. As in *Storer,* the direct party primary in New Hampshire is not "merely an exercise or warm–up for the general election but an integral part of the entire election process, the initial stage in a two–stage process by which the people choose their public officers. It functions to winnow out and finally reject all but the chosen candidate", 415 U.S. at 735, 94 S.Ct. at 1281.

In *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the Texas statutory scheme of regulation of the election of candidates from minority party and independent ranks was upheld, the Court making clear that both *Rosario, supra,* and *Kusper, supra,* established the rule that "to protect the integrity of party primary elections, States may establish waiting periods before voters themselves may be permitted to change their registration and participate in another par-

ty's primary", 415 U.S. at 786, 94 S.Ct. at 1308.

More recently, it has been held that a statute which determines the composition of the state committee of each major political party does not violate the right of party members to freedom of association as regards the activities of the committee so constituted relative to purely internal party decisions. *Marchioro v. Chaney,* 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979). And, much closer on the facts to the issues here raised by plaintiffs is the case of *Nader v. Schaffer,* 417 F.Supp. 837 (D.Conn.) (three–judge court), *aff'd without opinion,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). The statute there challenged provided that no person could vote in a party primary unless he was on the last completed enrollment list of such party in his respective voting district. Plaintiffs, who were Independent voters, raised similar challenges to those presented here by the plaintiffs, but these contentions were found to be without merit. In the course of its opinion, the Court said:

A state may legislate to prevent the perceived evils of crossover voting, *e. g., Rosario v. Rockefeller, supra,* but several states permit crossover voting in their primaries. Others have provision for primaries which allow participation by independents and members of other parties. There is no suggestion that such a clause makes the election laws unconstitutional, nor is it a mandatory prerequisite to constitutionality that independent, non–member electors be permitted to vote in a party's primary. The Connecticut General Assembly has adopted statutes governing political party primaries which it considers best meet the needs of the State. The laws are not invidiously discriminatory but apply to all alike. The legislatures of '[t]he states have broad discretion in formulating election policies.' *Tansley v. Grasso,* 315 F.Supp. 513, 519 (D.Conn. 1970) (three–judge court), citing *Williams v. Rhodes,* 393 U.S. 23, 34, 89 S.Ct. 5, [12] 21 L.Ed.2d 24 (1968); *United States v. Classic,* 313 U.S. 299, 311, 61 S.Ct. 1031

[1035], 85 L.Ed. 1368 (1941); and *Voorhes v. Dempsey,* 231 F.Supp. 975, 977 (D.Conn.1964) (three–judge court) (per curiam), *aff'd mem.,* 379 U.S. 648, 85 S.Ct. 612, 13 L.Ed.2d 552 (1965). Accord, *Bullock v. Carter, supra,* 405 U.S. [134] at 141 [92 S.Ct. 849 at 854, 31 L.Ed.2d 92] see also *Storer v. Brown, supra,* 415 U.S. at 729–30 and 736, 94 S.Ct. 1274 [, at 1278–1279 and 1282.]

*Nader,* 417 F.Supp. at 850.

If, as plaintiff Young suggests, one third of the voters of Hillsborough County, the most populous in New Hampshire, now seek to act as Independents without participation in an organized party, such persons cannot expect they will have or are entitled to have the same rights of choosing the candidate who is to run under a given party's banner as do the party faithful. As the *Nader* Court has pointed out, if the Independents wish to change the election laws which are not immutable, they may do so by getting one or more of their number on the ballots and working diligently for the election of one or more Independent representatives in the Legislature. 417 F.Supp. at 850. As the *Nader* Court concluded, and as this Court believes,

> Theoretically the laws are still made by the legislatures and, although the effort to achieve a change in the statutes requires a great deal of time, hard work and infinite patience, it is not impossible. The presently popular course of raising a federal constitutional question and seeking a change in the law by judicial fiat, is quicker, more academically attractive and perhaps more thorough. But such action tends in itself to work in derogation of the separation of powers and our democratic system of government. The courts should not use this power for the purpose of exercising 'some amorphous, general supervision of the operations of government', *United States v. Richardson,* 418 U.S. 166, 192, 94 S.Ct. 2940, 2954, 41 L.Ed.2d 678 (1974) (Powell, J., concur-

ring), but only to redress violations of basic human rights to which federal constitutional protections have been extended or to correct governmental action which otherwise conflicts with express provisions of the Constitution. The plaintiffs' case does not fall within these designations.

*Nader,* at 850.

Citizens who have attained voting age certainly do not require a spoon feeding and hand leading to assist them in the proper exercise of their franchise. While the Court fails to understand how a non–party voter who does not read a local newspaper or check local public notices can effectively decide what candidate or issues are significant in local elections, it is here clear that the provisions of RSA 654 deprive plaintiffs of no constitutional rights. In short, they do not serve to "lock" the plaintiffs into an unwanted party affiliation between elections, and any such confinement was clearly the result of these plaintiffs' voluntary failure to take reasonable and timely measures to change their registration. *Kusper, supra,* 414 U.S. at 60, 94 S.Ct. at 309. There is no merit to plaintiffs' contention that the effect of the statutes constitutes an unconstitutional abridgment of their use of time.

The foregoing shall constitute the findings and rulings of the Court pursuant to Rule 52(a), Federal Rules of Civil Procedure. There being no genuine issues of material fact which require further hearing in these matters, Rule 56(c), Fed.R.Civ.P., summary judgment is herewith entered in behalf of the defendant Gardner.[4]

SO ORDERED.

---

4. We have previously (n.2, *supra*) entered dismissal in behalf of the defendant Supervisors for insufficiency of service of process, but were they properly before the Court for decision on the merits, an order of summary judgment would likewise be entered on the record presented in behalf of such defendants.