REPUBLICAN PARTY OF the STATE OF CONNECTICUT, Lowell P. Weicker, Jr., Stewart B. McKinney, Nancy L. Johnson and Thomas J. D'Amore, Jr.

v.

Julia H. TASHJIAN, Secretary of the State of the State of Connecticut.

Civ. No. H 84–548 (JAC).

United States District Court,
D. Connecticut.

Dec. 5, 1984.

Stanley A. Twardy, David S. Golub, Silver, Golub & Sandak, Stamford, Conn., Ralph G. Elliot, Tyler, Cooper & Alcorn, Hartford, Conn., for plaintiffs.

Joseph I. Lieberman, Elliot F. Gerson, Daniel R. Schaefer, Henry S. Cohn, Hartford, Conn., for defendant.

Martin B. Margulies, University of Bridgeport School of Law, Bridgeport, Conn., Martha Stone, Connecticut Civil Liberties Union Foundation, Hartford, Conn., Burt Neuborne, American Civil Liberties Union, New York City, for amici curiae American Civil Liberties Union and Connecticut Civil Liberties Union Foundation.[1]

---

1. Due to the possible implications of this case for primary elections and the two-party system generally, the court extended an invitation to interested persons and organizations to participate as *amici curiae.* *See* Order (filed May 23, 1984). As the court has noted on previous occasions, the decision to invite these parties to participate as friends of the court was in no way motivated by questions concerning the capacity of existing counsel adequately to represent the interests of their clients. Rather, these arrangements—made without objection from either party—reflected the shared conviction that this lawsuit may possess broad-ranging significance and that the court would benefit from the presentation of widely divergent ideological, political and professional viewpoints on the constitutional issues in the litigation. Those who elected to participate as *amici curiae* argued generally in favor of the position asserted here by plaintiffs. *See* Certified Official Transcript of Oral Argument of July 5, 1984 (filed Dec. 4, 1984) ("Tr.") at 4–6.

Stephen E. Gottlieb Albany Law School, Albany, N.Y., for *amici curiae* F. Christopher Arterton, James MacGregor Burns, Barbara Burrell, William Crotty, Roman B. Hedges and John S. Jackson, III.[2]

## RULING ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

This case brings into dramatic conflict the power of states to regulate primary elections and the right of political parties to freedom of association under the First Amendment to the United States Constitution. The State of Connecticut has asserted a broad and discretionary claim to authority over the activities of political parties based on their integral involvement in the selection of candidates for public office. Plaintiffs acknowledge that political parties are not typical voluntary organizations immune from state regulation and constitutional strictures,[3] but maintain that freedom of association would prove an empty guarantee if states were unrestrained in their ability to dictate eligibility requirements for participation in a party's candidate selection process.

The action challenges the validity of Connecticut's "closed primary law," Section 9–431 of the Connecticut General Statutes, which prohibits voters who are not enrolled in a political party from participating in primary elections.[4] This is the first case to present the situation in which a political party challenges a closed primary law on First Amendment grounds. Plaintiffs are the Republican Party of the State of Connecticut, the Chairman of the Republican State Central Committee, Thomas J. D'Amore, Jr., and the Connecticut Republican Party's principal federal elected officials, United States Senator Lowell P. Weicker, Jr. and United States Representatives Stewart B. McKinney and Nancy L. Johnson. The defendant is Julia H. Tashjian, Secretary of the State of the State of Connecticut ("Connecticut" or "defendant"), who is responsible for administering the challenged statute. Plaintiffs allege that Section 9–431 infringes their First Amendment right to associate for the advancement of common political objectives. They seek to have this court declare the statute unconstitutional and enjoin its enforcement.

In 1976, the constitutionality of the very statute at issue in this case was challenged by unaffiliated voters who desired to participate in primary elections against the express wishes of political parties. *See Nader v. Schaffer*, 417 F.Supp. 837 (D.Conn.) (three-judge court), *aff'd mem.*, 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). The court in *Nader* held that Connecticut was justified in preventing these unwanted intruders from disrupting party primaries. In this case, the Connecticut Republican Party is no longer a willing beneficiary of the protections afforded by the state's closed primary law. The party now seeks to open its candidate selection process to unaffiliated voters. Accordingly,

---

**2.** The *amici curiae* represented by Professor Gottlieb are professors of political science at Yale University, Williams College, the State University of New York at Albany, Northwestern University, the Graduate School of Public Affairs at the State University of New York at Albany, and Southern Illinois University at Carbondale, respectively. The statement submitted by these political scientists contained interesting arguments grounded in history and public policy. In the final analysis, however, the determination of issues in this case must be made exclusively on the basis of constitutional principles.

**3.** *Compare Seergy v. Kings County Republican County Committee*, 459 F.2d 308, 313–314 (2d Cir.1972) ("political parties are not immune from constitutional limitations merely because they are private groups") *with Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 167, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (racially discriminatory guest policies of private club are not within purview of Equal Protection Clause of Fourteenth Amendment).

**4.** Section 9–431 provides, in pertinent part:
No person shall be permitted to vote at a primary of a party unless he is on the last-completed enrolment list of such party in the municipality or voting district, as the case may be ....

the concern with barring unwelcome "outsiders" that motivated the result in *Nader* is not present here.

On January 14, 1984, the delegates to the state convention of the Connecticut Republican Party approved an amendment to the party rules permitting unaffiliated voters to join with enrolled Republicans in voting for candidates for the offices of United States Senator, United States Representative, Governor and the gubernatorial "underticket" in primary elections.[5] The amendment would not affect voter qualifications in other Republican Party primary elections, including those for seats in the Connecticut Senate and House of Representatives; enrollment in the party would continue to be a requirement for voting in those primaries. The amended party rule is in direct conflict with Section 9–431.

Because Section 9–431 substantially interferes with plaintiffs' associational rights, it is subject to strict judicial scrutiny. The statute can thus be upheld only if it is necessary to advance compelling state interests and if it advances those interests in the manner least restrictive of the ability of the Republican Party to structure its candidate selection process in the way it deems appropriate.[6]

In the circumstances of this case, the purposes purportedly served by Section 9–431—the prevention of raiding, the avoidance of voter confusion, and the preservation of the two-party system—are not compelling state interests justifying the substantial burden that the statute imposes on the exercise of plaintiffs' right of political association. Accordingly, Section 9–431 constitutes an impermissible infringement on First Amendment rights and it cannot be applied to prevent the Republican Party from including unaffiliated voters in certain of its primaries.

The court today holds not that participation by unaffiliated voters in party primaries is constitutionally required, but that a party's decision to permit unaffiliated voters to participate in its primaries is constitutionally protected.

## Discussion

Although the memoranda filed by the parties are lengthy, this is not a particularly complex case. The principal issues are relatively straightforward. They are, first, whether the dictates of Article I, section 2 of the Constitution and the Seventeenth Amendment (defining voter eligibility in elections for the federal House of Representatives and Senate, respectively) are applicable to primary elections; second, whether Article I, section 2 and the Seventeenth Amendment require that eligibility to vote in congressional elections be "absolutely symmetrical" to eligibility to vote in state legislative elections; third, whether Article I, section 4 (vesting in states the power to regulate the time, place, and manner of holding congressional elections) grants states virtually unreviewable power to regulate the conduct of primaries; fourth, whether the challenged statute constitutes so insubstantial an imposition on the right of association that courts need not strictly scrutinize the statute under the First and Fourteenth Amendments; and fifth, whether the interests proffered by Connecticut in support of its closed primary law are legitimate and sufficient to outweigh the burden that the statute imposes on plaintiffs' right of political association. The court will address each of these questions in turn.

---

5. The rule provides:
   Any elector enrolled as a member of the Republican Party and any elector not enrolled as a member of a party shall be eligible to vote in primaries for nomination of candidates for the offices of United States Senator, United States Representative, Governor, Lieutenant Governor, Secretary of the State, Attorney General, Comptroller and Treasurer.

6. *See Cousins v. Wigoda,* 419 U.S. 477, 489, 95 S.Ct. 541, 548, 42 L.Ed.2d 595 (1975); *Kusper v. Pontikes,* 414 U.S. 51, 58–59, 94 S.Ct. 303, 308–09, 38 L.Ed.2d 260 (1973); *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968).

## I. Political Parties and State Action

Article I, section 2, clause 1 of the United States Constitution provides:

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

The Seventeenth Amendment employs virtually identical language to delineate the class of persons eligible to vote in elections for United States Senator.[7]

Connecticut maintains that the Republican Party rule at issue in this litigation violates these constitutional provisions by permitting unaffiliated voters to participate in primaries for congressional offices while denying them a similar opportunity to vote in primaries for seats in the Connecticut General Assembly. Putting aside for the moment Connecticut's dubious interpretation of the relevant constitutional provisions, it is not apparent that Article I, section 2 and the Seventeenth Amendment have any application to primary elections whatsoever. Connecticut uncritically asserts that "the activities of a political party constitute state action" and thus that "there can be no question" that Article I, section 2 applies to primaries. Defendant's Reply to Plaintiffs' Memorandum Dated June 27, 1984 in Opposition to Motion to Dismiss (filed July 9, 1984) ("Defendant's Reply Memorandum") at 4. This conclusion rests on the selective use of passages from Supreme Court decisions, the reliance on dicta in United States v. Classic, 313

U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and an unwarranted extension of the so-called White Primary Cases.[8]

The White Primary Cases, in which the Supreme Court overturned a series of increasingly subtle tactics employed to exclude blacks from participating in the Texas Democratic Party's candidate selection process, do not stand for the proposition that all actions of political parties constitute state action without regard to the surrounding circumstances. See O'Brien v. Brown, 409 U.S. 1, 4 n. 1, 92 S.Ct. 2718, 2720 n. 1, 34 L.Ed.2d 1 (1972); Kester, Constitutional Restrictions on Political Parties, 60 Va.L.Rev. 735, 756–760 (1974); see also Ripon Society v. National Republican Party, 525 F.2d 567, 598–600 (D.C. Cir.1975) (Tamm, J., concurring), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). The White Primary Cases concerned discrimination against members of a suspect class. They thus reflect the principle that, in cases of invidious discrimination, a lesser degree of state involvement in private conduct is sufficient to trigger constitutional scrutiny. See, e.g., Janusaitis v. Middlebury Volunteer Fire Department, 607 F.2d 17, 23, 27 n. 16 (2d Cir.1979).[9] No discrimination against a "discrete and insular minority," United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778 n. 4, 82 L.Ed. 1234 (1938), is present on the facts of this case.

■ Absent a malfunctioning of the machinery of the Connecticut Republican Party that results in a perversion of its elector-

---

7. The Seventeenth Amendment provides, in pertinent part:

> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

8. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 345 U.S. 461 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Nixon v. Condon, 286 U.S.

73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

9. See also Girard v. 94th Street & Fifth Avenue Corp., 530 F.2d 66, 69 (2d Cir.), cert. denied, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); Weise v. Syracuse University, 522 F.2d 397, 405 (2d Cir.1975); Jackson v. Statler Foundation, 496 F.2d 623, 628–629 (2d Cir.1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); Lefcourt v. Legal Aid Society, 445 F.2d 1150, 1155 n. 6 (2d Cir.1971); Stewart v. New York University, 430 F.Supp. 1305, 1311 n. 6 (S.D.N.Y.1976).

al processes, such as the arbitrary exclusion of members of particular ethnic or religious groups, there is no basis for the state to interfere in the party's decision-making; the party's internal processes will supply any necessary corrective. "Where ... all persons who share the party's basic philosophy can participate more or less equally in fashioning party rules, there is no reason to set those rules aside merely because a legislative majority ... thinks it can do a better job." Brief of *Amici Curiae* American Civil Liberties Union and Connecticut Civil Liberties Union Foundation in Support of Plaintiffs' Motion for Summary Judgment (filed June 27, 1984) at 5; *see generally* J. Ely, *Democracy and Distrust* 135–179 (1980).[10]

Furthermore, the *White Primary Cases* were decided at a time when Texas was a one-party state and the Democratic Party nomination was tantamount to election to public office. *See Ripon Society v. National Republican Party, supra,* 525 F.2d at 598 (Tamm, J., concurring). Defendant could not seriously contend that anything resembling that situation is true of Connecticut at this time. Read as they must be in light of their factual underpinnings, the *White Primary Cases* do not support defendant's far-reaching view that the activities of political parties always constitute state action.

Connecticut's reliance on *United States v. Classic, supra,* is similarly misplaced. In *Classic,* the Supreme Court reversed the dismissal of an indictment against a Louisiana election official for fraudulently tabulating ballots in a primary election. The Court reasoned that primaries were such an "integral part" of the electoral process that the right to vote implicit in Article I of the Constitution, *see Ex Parte Yarbrough,* 110 U.S. 651, 662–664, 4 S.Ct. 152, 157–58, 28 L.Ed. 274 (1884), extended to them. Kester, *supra,* 60 Va.L.Rev. at 745–746. In *dicta,* the Court suggested that a *party* official also could be prosecuted for mis-

counting ballots in a primary election because the right to vote in congressional elections guaranteed by Article I is protected against state and private interference alike. *United States v. Classic, supra,* 313 U.S. at 315, 61 S.Ct. at 1037.

Any argument, based on this *dictum* in *Classic,* that the activities of political parties are, by definition, state action, is unfounded. *See Developments in the Law— Elections,* 88 Harv.L.Rev. 1111, 1158–1159 (1975); L. Tribe, *American Constitutional Law* § 13–23, at 789 n. 16 (1978). As Judge Tamm observed in his concurrence in *Ripon Society v. National Republican Party, supra,*

> the *Classic* holding was firmly grounded in the Article I protection of the right to vote in congressional elections, which also extends to private interferences, and thus cannot stand for the proposition that all nominating procedures closely related to general elections constitute state action.

525 F.2d at 599.

Defendant also argues that Article I, section 2 is applicable to political parties in primary elections even absent a finding of state action. *See* Defendant's Memorandum in Support of Motion to Dismiss (filed June 21, 1984) ("Defendant's Memorandum") at 17–18. This argument is premised on the isolated statement in *Classic* that "the constitutional command ... is secured against the action of individuals as well as of states." 313 U.S. at 315, 61 S.Ct. at 1038. Reading "the constitutional command" to mean its postulated "absolute symmetry" requirement, Connecticut concludes that Article I, section 2 directly prohibits political parties from establishing voting qualifications in primaries for congressional offices different from those for state legislative offices.

▮ This analysis is not borne out by a close reading of the opinion in *Classic.* It

---

10. *Cf. Mrazek v. Suffolk County Board of Elections,* 630 F.2d 890, 897 n. 11 (2d Cir.1980) ("The parties are best situated to define the proper constituencies of their nominating delegates,

and these determinations should not be invalidated unless ... [the process is] utilized to exclude or disadvantage discrete groups or minorities.").

is apparent that in referring to "the constitutional command," the Court was speaking of the right to vote implicit generally in Article I of the Constitution and not any alleged constitutional prescription of "absolute symmetry" in the definitions of voter eligibility in congressional and state legislative elections. *See Ex Parte Yarbrough, supra,* 110 U.S. at 662–664, 4 S.Ct. at 157–58; *United States v. Mosley,* 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915). It is the right to vote that is "without restriction or limitation" and thus protected from private as well as state-imposed interference. Connecticut's suggestion that the phrase "the constitutional command" in *Classic* refers to the explicit terms of Article I, section 2, adopting state voter qualifications for use in congressional elections, is groundless. Those provisions, by their terms, have no logical application to the conduct of private persons or entities.[11]

II. *The Meaning of Article I, Section 2*

■ Even assuming *arguendo* the existence of some principled basis for applying Article I, section 2 and the Seventeenth Amendment to primary elections, Connecticut has failed to demonstrate that these constitutional provisions mandate "absolute symmetry" or "unqualified symmetry and equality" in voter qualifications for congressional and state legislative prima-

ries. Defendant's painstaking review of the history of Article I, section 2 demonstrates only that nationally uniform voter qualifications for congressional elections were rejected by the Constitutional Convention in 1787 in favor of the diverse standards utilized by the states themselves in electing the corresponding branches of their legislatures. This expedient eliminated the difficulty of identifying a single standard mutually acceptable to all states[12] and insured that the House of Representatives would be elected by "the great body of the people of the United States." *The Federalist* No. 57, at 385 (J. Madison) (J. Cooke ed. 1961). The Founding Fathers were concerned that discrimination against federal interests might lead states to restrict the franchise in congressional elections, "render[ing] too dependent on the State Governments, that branch of the Federal Government, which ought to be dependent on the people alone." *The Federalist* No. 52, at 354 (J. Madison) (J. Cooke ed. 1961). In tying eligibility to vote in congressional elections to the qualifications for electors of the most numerous branches of state legislatures, the drafters of the Constitution sought to prevent states from restricting popular participation in congressional elections; this goal was accomplished by the requirement that any such restriction of the franchise in congressional

11. It is possible that the notion of "absolute symmetry" so vigorously embraced by defendant, if adopted by the courts, could have some unexpected, not to say bizarre, consequences, as suggested by the following exchange between the court and plaintiffs' counsel during oral argument:

> Mr. Elliot: The United States Constitution requires only that the U.S. Senate electors and the U.S. House electors have the same qualifications as electors do who vote for the State House of Representatives, and there is nothing in this case to indicate that that is not so....
>
> The State argues [,however,] that the U.S. Constitution requires that everyone who can vote for the State House of Representatives must be able to vote in the Republican primary for U.S. Representative and U.S. Senator....
>
> The State's argument would thus invalidate Section 9–431 because it limits the right to vote in Democratic primaries to Democrats and in Republican primaries to

> Republicans and does not open up all of the primaries to all of the voters who can vote for the State House of Representatives.
>
> The Court: But then your argument is that the so called open primary is constitutionally mandated?
>
> Mr. Elliot: No. Our argument is that *the State's argument is that the open primar[y] is constitutionally mandated so that all voters in all parties can vote in each party's primaries.*

Tr. 21–23 (emphasis supplied); *see also* Tr. 25–26, 29–30, 38–40, 43–44.

12. 1 Story, *Commentaries on the Constitution of the United States* § 584, at 418 (T. Cooley 4th ed. 1873) ("the reducing of the different qualifications, already existing in different States, to one uniform rule, would have been a difficult task, even to the convention itself, and would be dissatisfactory to the people of different States").

elections be accompanied by an identical narrowing of the electorate in state legislative contests.

None of this suggests the slightest concern with symmetry in the abstract, as a value meriting protection in its own right. Neither the language nor the history of Article I, section 2 precludes a more expansive classification of eligible voters in congressional as opposed to state legislative elections, and defendant's repeated insistence that the Constitution requires "absolute symmetry" does not make it otherwise. To guarantee that the House of Representatives would be elected by the general populace, the framers devised a method of dissuading states from capriciously restricting the franchise in congressional elections. Those qualified to vote for members of the most numerous branches of state legislatures are entitled to vote for members of the House of Representatives; a more restrictive standard is constitutionally impermissible. It does not logically follow from this, however, that a less restrictive standard is similarly proscribed. In fact, it is arguable that a standard that opens the political process by including greater numbers of voters in congressional primaries furthers, rather than undermines, the democratic values underlying Article I, section 2.

■ Defendant's unexplained assertion that "the power to discriminate in favor of 'openness' implies the power to discriminate for narrow purposes," Defendant's Memorandum at 9, is without merit. The ability to expand but not contract the pool of eligible voters in congressional primaries is the functional analogue of Justice Brennan's famous "ratchet" theory concerning the power of Congress to enforce the Fourteenth Amendment. Under that theory, Congress may enact laws that strengthen guarantees under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as interpreted by the Supreme Court, but may not dilute those guarantees. *See Katzenbach v. Morgan*, 384 U.S. 641, 651 & n. 10, 86 S.Ct. 1717, 1724 at n. 10, 16 L.Ed.2d 828 (1966).[13] In a similar vein, although states under no circumstances may limit rights beyond constitutionally required minima, they may in certain instances extend the reach of rights guaranteed by the Constitution.[14]

### III.  *Article I, Section 4*

■ Connecticut maintains that Article I, section 4 of the Constitution—which vests in state legislatures the power to regulate the time, place and manner of holding congressional elections [15]—authorizes states to trump the choices of a political party regarding the structure of its candidate selection process. *See* Defendant's Memorandum at 36–39. The weakness of this argument is revealed by the paucity of authority marshaled in support of it. Connecticut places principal reliance on *dicta* in *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974), to the effect that "[i]t is very unlikely that all or even a large portion of the state election laws would fail to pass muster" under existing Supreme Court precedents. This is less than a ringing affirmation of the expansive view of state regulatory power urged by Connecticut.

Connecticut then embarks on an extended review of election law cases in search of pronouncements arguably supportive of the

---

**13.** *See also Oregon v. Mitchell,* 400 U.S. 112, 249 n. 31, 91 S.Ct. 260, 327 n. 31, 27 L.Ed.2d 272 (1970) (Brennan, J., concurring in part and dissenting in part); G. Gunther, *Cases and Materials on Constitutional Law* 1096–1104 (10th ed. 1980); Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms,* 91 Harv.L. Rev. 1212, 1230–1231 & n. 63 (1978). For the related views of Judge Jon O. Newman, *see* note 14, *infra,* and accompanying text.

**14.** *See* Newman, *The "Old Federalism": Protection of Individual Rights by State Constitutions in an Era of Federal Court Passivity,* 15 Conn.L. Rev. 21, 25 (1982).

**15.** Article I, section 4, clause 1 provides:
The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

position that state power to regulate primary elections knows few bounds. This exercise accomplishes little but reiteration of the basic principle that states are empowered to enact laws regulating primary elections if, and only if, such legislation does not transgress some specific constitutional limitation. *See Rodriquez v. Popular Democratic Party of Puerto Rico,* 457 U.S. 1, 13, 102 S.Ct. 2194, 2201, 72 L.Ed.2d 628 (1982) ("[a]bsent some clear constitutional limitation"); *Oregon v. Mitchell,* 400 U.S. 112, 125, 91 S.Ct. 260, 265, 27 L.Ed.2d 272 (1970) ("within the limits of the Constitution").[16] The right to associate with others for the advancement of common political beliefs or objectives is just such a constitutional limitation on the authority of government. *See Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 307–08, 38 L.Ed.2d 260 (1973); *Democratic Party of the United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 121–122, 101 S.Ct. 1010, 1018–19, 67 L.Ed.2d 82 (1981).

## IV. *The Standard of Review*

Connecticut concedes that "substantial burdens on the right to ... associate for political purposes can only be justified if they serve a compelling state interest." Defendant's Memorandum at 67, *citing Nader v. Schaffer, supra,* 417 F.Supp. at 849. The state maintains, however, that Section 9–431 imposes only incidental burdens on plaintiffs' freedom of political association and thus that the statute need only be rationally related to the achievement of a legitimate state purpose in order to pass constitutional muster. *See* Defendant's Reply Memorandum at 9–12.

In contending that Section 9–431 is subject to this deferential standard of review, defendant relies solely on cases involving challenges by individual voters to state-imposed party affiliation requirements that were not opposed by the parties themselves. *See* Defendant's Memorandum at 69 n. 9. Put very simply, this is a different case.[17]

The argument that a party affiliation requirement constitutes only a *de minimis* burden on associational rights rests on the notion that any "communality" of interests "between the excluded individual and the group from which he is excluded," *Developments in the Law—Elections, supra,* 88 Harv.L.Rev. at 1166, is belied by the independent voter's refusal "to express a commitment to the party and to the party's basic ideas," Defendant's Memorandum at 64. As stated by one commentator:

> There can be little objection to a requirement that those wishing to vote in a party's primary profess that, as of that time, they are affiliated with that party. Absent a willingness to profess such affiliation, it would be tenuous to assert that substantial associational rights were being abridged; without a communality of interests, there is little association to abridge.

L. Tribe, *supra,* § 13–23, at 793, *quoted in* Defendant's Memorandum at 68; *see also Nader v. Schaffer, supra,* 417 F.Supp. at 843.[18]

---

**16.** The concept is best conveyed by defendant in a single sentence:

> In summary, the State of Connecticut has the power to enact laws, *within constitutional limits,* setting qualifications for voting in a primary election.

Defendant's Memorandum at 64 (emphasis added).

**17.** Defendant here runs afoul of the principle that cases must be construed in light of their facts.

A similar criticism can be made of the arguments of Professor Ronald Rotunda, on which defendant relies. *See* Defendant's Reply Memorandum at 11 n. 5. Professor Rotunda attributes to plaintiffs the position that "[e]ven though a nonparty member could not force an open primary and invalidate ... [a state closed primary] law, the political party could, if it chooses to do so." He then concludes that such a position "does not find support in the case law." Letter from Ronald D. Rotunda to Judge José A. Cabranes (dated June 15, 1984) at 2. This conclusion is unpersuasive inasmuch as no reported case has ever addressed the situation in which a political party, rather than an independent voter, challenges a closed primary law on First Amendment grounds.

**18.** *Cf. Democratic Party of the United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 133, 101 S.Ct. 1010, 1024, 67 L.Ed.2d 82 (1981) (Powell, J., dissenting) ("As party affiliation becomes this easy for a voter to change in order to

The analysis is persuasive in the case of challenges by independent voters to state laws excluding them from participation in primary elections. The ability to comply with the essentially *pro forma* requirement of affiliation is exclusively in the hands of the complaining independent voter. Moreover, the countervailing right of a political party to be free from unwelcome intrusions must be weighed in the balance. Finally, the independent voter's claim to a "communality" of interests with the party in whose primary he seeks to vote is indeed tenuous in light of his refusal to take the simple and largely formalistic step of affiliating with the party.

The analysis is substantially less persuasive when a party is challenging a state law excluding independent voters from its primaries. As noted above, independent voters possess the ready means to overcome the burden on associational rights imposed by a closed primary law. The same cannot be said of the party itself. In cases relied upon by Connecticut, the plaintiffs were unaffiliated voters who sought to participate in primary elections having intentionally failed to comply with statutory prerequisites for voting in such elections.[19] Accordingly, some doubt was cast upon their asserted "communality" of interests with the party in whose primary they sought to vote. In this case, on the other hand, there is nothing the Connecticut Republican Party can do within the terms of Section 9–431 to permit unaffiliated voters to participate in its primaries. The statute's affiliation requirement is thus a real and formidable obstacle to a party which seeks to broaden its appeal by including unaffiliated voters in its candidate selection process.

The analysis relied on by defendant also presupposes that parties are the willing beneficiaries of laws that preserve their institutional integrity by barring "gate-crashers" with adverse political views from sabotaging their decisionmaking. *See Ray v. Blair*, 343 U.S. 214, 221–222, 72 S.Ct. 654, 657–58, 96 L.Ed. 894 (1952) (states may protect parties "from intrusion by those with adverse political principles").[20] This is not the situation when a political party is contesting a state-imposed affiliation requirement, in which case the party obviously does not welcome "protection" against efforts by "outsiders" to participate in the party's candidate selection process. If the Connecticut Republican Party opts to invite "outsiders" to vote in its primaries, these "outsiders," by definition, are not intruders.

Defendant's reliance on *Democratic Party of the United States v. Wisconsin ex rel. LaFollette, supra,* stands that case on its head. When the Supreme Court observed that "freedom to associate for the 'common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association," 450 U.S. at 122 (citations omitted), it was speaking of the power not of states but of political parties. As one commentator has noted, it is unclear "[w]hat meaning ... freedom of association [can] have if *the association* has no control over who can participate in its decisionmaking." Note, *Democratic Party v. Wisconsin: May States Impose Open Primary Results Upon a National Party Convention?,* 59 Denver L.J. 611, 620 (1982) (emphasis added).

Moreover, while there may be justification for rejecting claimed violations of associational rights asserted by voters who refuse to take the mechanical step of affiliating with the party, it does not follow that only those persons who have enrolled in a political party are capable of "shar[ing] the interests and persuasion that underlie the

participate in a primary election, the difference between open and closed primaries loses its practical significance.").

**19.** *See, e.g., Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952);

*Nader v. Schaffer,* 417 F.Supp. 837 (D.Conn.) (three-judge court), *aff'd mem.,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976).

**20.** *See also* Gottlieb, *Rebuilding the Right of Association: The Right to Hold a Convention as a Test Case,* 11 Hofstra L.Rev. 191, 198 (1982).

association's being," *Democratic Party of the United States v. Wisconsin ex rel. LaFollette, supra,* 450 U.S. at 122 n. 23, 101 S.Ct. at 1019 n. 23, *quoting* L. Tribe, *supra,* § 13-23, at 791. Political beliefs are not susceptible to such rigid compartmentalization. *See Rosario v. Rockefeller,* 410 U.S. 752, 769, 93 S.Ct. 1245, 1255, 36 L.Ed.2d 1 (1973) (Powell, J., dissenting) ("the political parties in this country traditionally have been characterized by a fluidity and overlap of philosophy and membership"); Note, *The Constitutionality of Non-Member Voting in Political Party Primary Elections,* 14 Willamette L.J. 259, 290 (1978). It is not for the Connecticut legislature to determine whether or not the goals and aspirations of the Connecticut Republican Party can be shared by independent voters who, for whatever reason, have chosen not to become members of that party.

■ The ultimate goal of any political party is to take control of the levers of government in order to achieve its objectives. *See Storer v. Brown, supra,* 415 U.S. at 745, 94 S.Ct. at 1286, 39 L.Ed.2d 714. In order to accomplish this goal, a minority party such as the Connecticut Republican Party [21] may wish to nominate candidates who will attract support in the general election from persons who are not members of that party. *See Bode v. National Democratic Party,* 452 F.2d 1302, 1309 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). The party rule at issue in this litigation is

designed to increase the likelihood that candidates with such broad appeal will emerge from the party's primaries. Any effort by the state to substitute its judgment for that of the party on this question—the question of who is and is not sufficiently allied in interest with the party to warrant inclusion in its candidate selection process—substantially impinges on First Amendment rights.[22] Accordingly, Section 9-431 must be subjected to strict judicial scrutiny under the First Amendment.

## V. *The Purported Interests of the State*

■ Under the strict scrutiny analysis the court is thus required to undertake, Section 9-431 can be upheld only if it is narrowly tailored to serve compelling state interests. Connecticut maintains that its closed primary law furthers a number of "important state interests, all of which may be classified under the general rubric of 'preserving the integrity of the electoral process.'" Defendant's Memorandum at 75, *quoting Democratic Party of the United States v. Wisconsin ex rel. LaFollette, supra,* 450 U.S. at 121, 101 S.Ct. at 1019, 67 L.Ed.2d 82. These interests are principally three: (1) preventing raiding; (2) avoiding voter confusion; and (3) promoting a stable two-party system. *Id.* at 76, *quoting Developments in the Law—Elections, supra,* 88 Harv.L.Rev. at 1168–1169; *see Nader v.*

---

**21.** As of October 1983, there were 659,268 registered Democrats, 425,695 registered Republicans, and 532,723 registered but unaffiliated voters in the State of Connecticut. Joint Statement of Facts ¶ 1 (filed June 6, 1984). As counsel for plaintiffs asserted at oral argument, "the Republican Party recognizes that in general elections, because of the ... breakdown of Republican, Democrat and unaffiliated voters, that for the Republican Party to win in general elections it needs the support of unaffiliated voters." Tr. 56; *see also* Tr. 66; note 28, *infra,* and accompanying text.

**22.** As the Supreme Court noted in *Democratic Party of the United States v. Wisconsin ex rel. LaFollette, supra,*
  [i]t is for the National Party—and not the Wisconsin Legislature or any court—to deter-

mine the appropriate standards for participation in the Party's candidate selection process. 450 U.S. at 124 n. 27, 101 S.Ct. at 1020 n. 27; *see also Opinion of the Justices to the Governor,* 385 Mass. 1201, 1207–1208, 434 N.E.2d 960, 963–964 (1982). *But see Bellotti v. Connolly,* 460 U.S. 1057, 1063 & n. 3, 103 S.Ct. 1510, 1513 n. 3, 75 L.Ed.2d 938 (1983) (Stevens, J., dissenting) (observing that the *Democratic Party* case involved a state's attempt "to control delegates in a nationwide party contest"); Rotunda, *Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda,* 53 Tex.L. Rev. 935, 950–951 (1975) (arguing that statutes regulating national political parties constitute extraterritorial extensions of state jurisdiction and must therefore be justified by "special interests").

*Schaffer, supra,* 417 F.Supp. at 845. None of these interests is sufficient to outweigh the burden on plaintiffs' associational rights imposed by Section 9–431.

Raiding is a practice "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Rosario v. Rockefeller, supra,* 410 U.S. at 760, 93 S.Ct. at 1251. Connecticut's avowed interest in preventing raiding is of questionable relevance in this case, inasmuch as the party rule at issue permits only unaffiliated voters to participate in Republican Party primaries; no such invitation has been extended to Democrats or members of other political parties. In any event, the spectre of Democratic voters severing ties with their party *en masse* in order to mount a raid on a Republican Party primary is effectively eliminated by Section 9–59 of the Connecticut General Statutes (a law not directly at issue here), which provides that a person affiliated with one party may not vote in the primary of another party within six months after leaving his original party.[23]

Any professed concern with raiding by *unaffiliated* voters—an anomalous concept to begin with—is contradicted by Public Act 84–118, effective January 1, 1985, which permits unaffiliated voters to affiliate with a political party up to one day prior to a primary election.[24] This statute already has eliminated any real obstacle to "raiding" by independent voters bent on disrupting the candidate selection process of a political party.

The second interest articulated by defendant in support of Section 9–431, that of avoiding voter confusion "by ensuring that the candidate who wins a party primary is that candidate who best represents the views of party members," Defendant's Memorandum at 90, is illegitimate.[25] Connecticut may well have an interest in "fostering an informed electorate." *Id.; see Anderson v. Celebrezze,* 460 U.S. 780, 796, 103 S.Ct. 1564, 1573, 75 L.Ed.2d 547 (1983). However, that interest does not authorize the state to gauge, much less determine, whether candidates for public office adequately reflect the views of their parties. Connecticut presents no reasoned argument in support of its assertion that it has a legitimate interest in protecting "voters who rely on party labels as representative of certain ideologies." Defendant's Memorandum at 91. It is not obvious that unthinking reliance on party labels is a practice that ought to be encouraged in any event, but protecting voters who, in a general election, reflexively pull a party's lever in the voting booth, and may thereby be "mis-

---

**23.** Section 9–59 of the Connecticut General Statutes provides, in pertinent part:

... Any elector whose name has been transferred from one enrolment list to another or who has applied for erasure ... shall not be entitled to vote in a ... primary of any party ... for a period of six months from the date of the filing of his application for transfer or for erasure.

**24.** Public Act 84–118 provides, in pertinent part: ... The application shall be effective as of the date of its execution and any person making application for enrolment in such manner shall immediately be entitled to the privileges of party enrolment unless he executes the application for enrolment after [the fourteenth] TWELVE O'CLOCK NOON ON THE LAST BUSINESS day before a primary, in which case he shall be entitled to the privileges of party enrolment immediately after the primary ....
1984 Conn.Legis. Service No. 4, at 10 (West) (bracketed language deleted from and capital-

ized language added to prior statutory provision).

**25.** Comments in *Nader v. Schaffer, supra,* 417 F.Supp. at 845, to the effect that a state has a "legitimate ... interest in protecting the overall integrity of the historic electoral process" cannot be employed to support defendant's arguments in this litigation. The *Nader* case involved a challenge by independent voters to the affiliation requirement of Section 9–431 and thus the central concern was the prevention of raiding. A conviction that political parties are ill-equipped to protect themselves from the disruptive effects of raiding led the court to conclude that "in the regulated situation, the state has a legitimate interest in protecting party members' associational rights, by legislating to protect the party 'from intrusion by those with adverse principles.'" *Id., quoting Ray v. Blair, supra,* 343 U.S. at 221–222, 72 S.Ct. at 657–58. (1952).

led," simply does not rise to the level of a compelling state interest. Whether to pursue an electoral and political strategy that assures voters that party nomination implies a recognizable ideology (or other types of political values) is a matter for each political party, not the state, to decide. Connecticut has no compelling interest in so rigidly constraining the contours of party politics.[26]

The third interest advanced by Connecticut to justify its closed primary law, apparently closely related to the second, is maintenance of the stability of the state's two-party system. Viewing the pivotal question as "which primary system [*i.e.*, "open" or "closed"] is better," Connecticut maintains that the legislature's choice of a closed primary represents the best judgment of political scientists as to "the means of emphasizing the differences between the parties ... and thereby encouraging voting." Defendant's Reply Memorandum at 13 & n. 7.[27] Defendant has misconstrued the issue before this court.[28] The controversy does not center on which form of primary election is more desirable, but rather, on whether there are compelling state interests to justify imposition of a closed primary structure on an objecting party. It is not apparent that maintaining the two-party system in its present configuration rises to the level of a compelling

state interest sufficient to validate the limitation on First Amendment rights present in this case. Much less is it clear that the state's imposition of a closed primary structure on an unwilling party furthers the state's purported interest.

Connecticut has failed to explain how permitting unaffiliated voters to participate in Republican Party primaries will lead to the splintered parties and unrestrained factionalism[29] that it professes to fear, or how any such result would justify a substantial infringement on plaintiffs' right of association. The Connecticut Republican Party's attempt to broaden its appeal by including unaffiliated voters in its primaries, whatever its practical effects, cannot be foreclosed on defendant's unsupported assertion that this action somehow will "discourage a politics of coalition and accommodation," Defendant's Memorandum at 81, *quoting* A. Bickel, *Reform and Continuity* 21–22 (1971).

To the extent that Section 9–431 is defended on the grounds that it preserves the Connecticut Republican Party in its present form, the defendant's position is untenable. Absent an invidious design effectively to limit participation in the electoral process, the efforts of a political party to alter its character—indeed, to reshape itself alto-

26. A logical but unarticulated extension of defendant's argument would permit a state to displace a party's choice of candidates whenever the state determines that the candidate's views are so antithetical to those of the party that permitting him to run on the ticket in the general election would engender "voter confusion." While such a result would comport with the notion that political parties are mere functionaries carrying out tasks delegated to them by the state, it is utterly inconsistent with the freedom of political parties to associate for the advancement of common beliefs guaranteed to them by the First Amendment.

27. Connecticut's counsel has asserted that it would be "a very legitimate interest of the State" to enact legislation designed to foster party differentiation along ideological and other political lines. *See* Tr. 80–81.

28. The *amici curiae* political scientists correctly note that the real issue is the "right of political parties to choose the basis on which to seek the

support of the American public." Statement of F. Christopher Arterton, *et al.* and Supporting Memorandum of Law (filed June 26, 1984) at 1.

29. In any event, it is possible that the challenged rule actually would decrease the likelihood of political fragmentation by encouraging independent voters to participate in the affairs of an existing political party. As one commentator has noted:

Inasmuch as parties in competitive systems seek to win the electoral support of groups that may not be particularly predisposed toward political participation, the parties serve to pull these groups into more active involvement in the polity and thus to integrate them into the political system and its processes.

Dawson, Social Development, Party Competition, and Policy, in *The American Party Systems* 208–209 (W. Chambers & W.D. Burnham eds. 1967).

gether—by redefining who may participate in its affairs is of no concern to a state.

■ There is nothing legitimate or reasonable, much less compelling, about an asserted state interest in freezing the parties in *status quo*.[30] Whether or not permitting unaffiliated voters to participate in primary elections somehow will "destabilize" the Republican Party is a matter for Republicans to consider; it is not an appropriate subject for state legislation. Whether the course chosen by a party leads to success and power or to failure and decline, the First Amendment ensures that that course will be the choice of the party, not the state.

### Conclusion

■ Section 9–431 of the Connecticut General Statutes imposes substantial burdens on plaintiffs' right of association under the First and Fourteenth Amendments of the United States Constitution and is not supported by compelling state interests. Accordingly, as applied to the Republican Party rule permitting unaffiliated voters to participate in certain Republican Party primaries, the statute abridges the right of association guaranteed by the First Amendment and that abridgement must be enjoined. Plaintiffs' motion for summary judgment is therefore granted and defendant's motion to dismiss is denied.

It is so ordered.

---

**30.** "The principle is plain that there can be no interference with freedom of expression on the general ground that it will lead to social change, or change at the wrong rate, or in the wrong direction."  T. Emerson, *The System of Freedom of Expression* 47 (1970).